# In the United States Court of Federal Claims

No. 08-852C
(Filed Under Seal: September 28, 2009)
(Reissued for Publication: October 16, 2009)[1]

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| DAVID WARD, | \* |
| | \* |
| Plaintiff, | \* |
| | \* |
| v. | \* |
| | \* |
| THE UNITED STATES, | \* |
| | \* |
| Defendant. | \* |

RCFC 12(b)(1); RCFC 52.1; Substantial Evidence; Incapacitation Pay; 37 U.S.C. § 204(g)-(h); Army Regulation 135-381 (June 1, 1990); Ability to Perform Military Duties; Civilian Income

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Michael D. J. Eisenberg, Washington, DC, for plaintiff.

Stacey K. Grigsby, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In the instant action, plaintiff, a Lieutenant Colonel in the United States Army Reserve ("Reserve"), seeks incapacitation pay related to injuries that he sustained during his service in Kuwait and Iraq during Operation Enduring Freedom. Defendant has moved to dismiss the complaint pursuant to Rule 12(b)(1) of the Rules of the United States Court of Federal Claims ("RCFC"), contending that the court lacks jurisdiction over plaintiff's claim. In the alternative, defendant requests judgment on the administrative record pursuant to RCFC 52.1, arguing that the denial of plaintiff's request for incapacitation pay was proper. As discussed in more detail below, the court grants in part and denies in part defendant's motion to dismiss and grants defendant's motion for judgment on the administrative record.

---

[1]  The court originally filed this opinion under seal due to its detailed description of plaintiff's medical history. If either party believed that this opinion contained protected material that should be redacted prior to the opinion being made available to the public, the party was to file, by October 9, 2009, a motion requesting redaction. Neither party filed such a motion.

# I. BACKGROUND[2]

After his graduation from law school and admission to the bar of the Commonwealth of Pennsylvania in 1978, AR 127-28, plaintiff commenced the practice of law as a civilian, id. at 18, 312. In October 1984, while working at the Commonwealth's Department of Health and pursuing a master's degree in Public Administration, id. at 18, 131, 312, plaintiff accepted an appointment as a Reserve commissioned officer in the Judge Advocate General's Corps of the United States Army ("Army"), id. at 308, 310. Over the following eighteen years, plaintiff received exemplary performance evaluations for his work in the Reserve, id. at 149-88, and ultimately rose to the rank of Lieutenant Colonel, id. at 215.

In August 2002, plaintiff received orders to mobilize in support of Operation Enduring Freedom. Id. at 212. It is unclear from the record what his employment status was at the time of his mobilization. See id. at 17 (noting an Active Duty for Special Work ("ADSW") assignment in Japan concluding on February 9, 2002, and the commencement of active duty on August 11, 2002, but no military or civilian employment for the six months in between), 214 (indicating that plaintiff was released from an Individual Mobilization Augmentation ("IMA") assignment in Japan effective June 3, 2002), 216 (indicating that plaintiff was released from his ADSW assignment in Japan on February 8, 2002). Nevertheless, he reported as directed and ultimately served on active duty from August 11, 2002, through August 10, 2003. Id. at 207. During that time, plaintiff served as the Chief of the Administrative Law Section of the Office of the Staff Judge Advocate ("SJA"), Coalition Forces Land Component Command ("CFLCC") at Camp Doha, Kuwait, and the officer-in-charge of the CFLCC-SJA branch office at Camp Arifjan, Kuwait. Id. at 115, 148. His last day in Kuwait was May 11, 2003. Id. at 114-15.

Upon returning to the United States, plaintiff reported to Fort Benning, Georgia. Id. at 207-08. While at Fort Benning, plaintiff sought Line of Duty determinations for injuries he sustained overseas.[3] Id. at 42. The injuries included trauma to his right knee sustained while running to a bomb shelter during a missile attack, id. at 108, 110, and Posttraumatic Stress Disorder ("PTSD"), id. passim. Plaintiff also sought related medical treatment at Fort Benning. On May 13, 2003, he was seen at the Community Mental Health Clinic at Martin Army

---

[2] The court derives the facts in this section solely from the administrative record ("AR").

[3] A soldier on active duty is presumed to have sustained an injury in the line of duty in most cases of "disease" and "[i]n the case of injuries clearly incurred as a result of enemy action or attack by terrorists." Army Regulation 600-8-1, § 39-2(a)(1)-(2) (Sept. 18, 1986). A finding that a soldier's injury was sustained in the line of duty is a prerequisite for the soldier to qualify for related benefits, such as incapacitation pay. Army Regulation 135-381, §§ 3-3, 4-1(d) (June 1, 1990).

Community Hospital on Fort Benning with "symptoms related to marital problems."[4]  Id. at 5, 30.  Then, in June 2003, at the same hospital, plaintiff underwent surgery on his right knee.  Id. at 106-08, 110-13.

On July 17, 2003, plaintiff sent an electronic mail message to Lieutenant Colonel James S. Eicher, the Army Human Resources Command's Legal Services Personnel Management Officer, noting his upcoming release from active duty and requesting that the positions for which he was being considered be limited to those in the St. Louis area.[5]  Id. at 31; accord id. at 6.  On the same day, plaintiff was seen by a military psychiatrist, who discussed PTSD and Partner Related Problem ("PRP") symptoms with him.[6]  Id. at 5, 30.  The psychiatrist indicated in his records that plaintiff was stable and that his chart should be closed.  Id. at 30.  Further, the psychiatrist did not make any notations concerning whether plaintiff should have been retained on active duty for treatment purposes or whether plaintiff was capable of performing military duty or civilian employment.  Id.

Plaintiff underwent a separation physical examination on July 18, 2003, and was medically cleared for release from active duty.  Id. at 5, 30.  The only physical limitation noted during his examination was that he should be allowed to replace the two-mile run with bicycling.  Id. at 30.  Accordingly, plaintiff returned home to the St. Louis area to serve out the remainder of his year on active duty.  See id. at 208.  During this time, he became a patient at the United States Air Force Medical Center at Scott Air Force Base, Illinois, where he was treated in the Life Skills Clinic for his PTSD and PRP symptoms.[7]  Id. at 102-05.  It appears that plaintiff had four appointments at the Life Skills Clinic while still on active duty.  He reported issues with concentration at two of the appointments.  Id. at 103, 105.  But see id. at 102 (indicating that the physician did not observe any evidence of impaired concentration).  Records from three of the appointments contained the following disposition: "Released without limitations."  Id. at 103-05.

---

[4]  Although medical records from this visit are not included in the administrative record, the visit is noted in two other documents.  The Army Human Resources Command Surgeon ("Command Surgeon") in St. Louis, Missouri described the visit in findings supporting his denial of plaintiff's application for incapacitation pay.  AR 30.  In addition, the Army Board for Correction of Military Records ("ABCMR") mentioned the visit in its Record of Proceedings upholding the Command Surgeon's denial.  Id. at 5.

[5]  The electronic mail message is not included in the administrative record but is described by both the Command Surgeon and the ABCMR.  See AR 6, 31.

[6]  The record from this visit is not included in the administrative record but is described by both the Command Surgeon and the ABCMR.  See AR 5, 30.

[7]  The copies of the records from Scott Air Force Base are of poor quality and are, at times, illegible.  However, because these are the records that the ABCMR reviewed, the court's review is constrained to these copies.

The disposition of the fourth appointment was: "Released [unclear, but probably "with"] work/duty limitations."[8] Id. at 102.

On August 10, 2003, plaintiff was "released from active duty, not by reason of physical disability . . . ." Id. at 207-08. His orders indicated that he was eligible for medical care for sixty days after his release.[9] Id. at 208. During that sixty-day period, plaintiff remained a patient at the Life Skills Clinic on Scott Air Force Base. Id. at 88-101. Plaintiff continued to report difficulties with concentration and how those difficulties affected his legal work. Id. at 88, 90, 92-93, 95, 97, 100. In addition, many of the records from this time period indicate that plaintiff, while qualified for duty worldwide, was not to be deployed. Id. at 91, 94, 96, 98-99, 101. Despite the recommendation against deployment, most of the records from this time period indicate a disposition of "[r]eleased without limitations." Id. at 88-93, 95-98, 100. However, the records from three appointments note the following disposition: "Released [unclear, but probably "with"] work/duty limitations." Id. at 94, 99, 101.

In addition to continuing his medical treatment during the sixty days following his release from active duty, plaintiff explored employment opportunities.[10] He sent an electronic mail message to Lieutenant Colonel Eicher on August 20, 2003, asking whether there was "[a]ny news on anything additional out there[.]" Id. at 27. The following day, he sent another electronic mail message to Lieutenant Colonel Eicher indicating that he was "[s]till producing resumes and getting leads," but that there were "no bites yet." Id. at 26. Then, in an October 4, 2003 electronic mail message, he asked Lieutenant Colonel Eicher how to obtain details about a particular IMA assignment. Id. at 25.

In the meantime, on October 1, 2003, plaintiff received notice that his applications for Line of Duty determinations for three of his injuries–all but his PTSD–had been approved. Id. at 42-43, 55. Shortly thereafter, Colonel Sandy Pufal of the Office of the Assistant Secretary of

---

[8] Comparing the various pages upon which this disposition appears, it is probable that the illegible word is "with." See, e.g., AR 94, 99, 101-02.

[9] The orders releasing plaintiff from active duty were issued on July 17, 2003. AR 208. However, plaintiff alleges that he was informed that he would have 120 days of transitional health benefits and that it was not until "his date of discharge"–August 10, 2003–that he was informed that his "transitional care would be limited to 60 days." Id. at 43; see also id. at 68 (reflecting plaintiff's September 6, 2003 contention that he relied upon information provided by the medical liaison officer at Fort Benning that he was eligible for 120 days of transitional health care when deciding to return home to the St. Louis area).

[10] Plaintiff's self-prepared military biography reflects actual employment in 2003 as a "Final Agency Decision Adjudicator" with JDG Associates in St. Louis. AR 16, 18. This employment is not addressed by the Command Surgeon or the ABCMR, nor is it further explained elsewhere in the administrative record.

Defense-Reserve Affairs informed him that with these determinations, he was eligible for treatment at military treatment facilities for the covered injuries.  Id. at 54.  Colonel Pufal also explained that plaintiff was eligible for treatment at a Department of Veterans Affairs ("VA") facility for the two-year period following his service overseas, and that it was at the VA where he could receive treatment for his PTSD.[11]  Id.  Indeed, Colonel Pufal indicated that Line of Duty determinations were "not being written" for PTSD.  Id.  From this information, plaintiff inferred that he could obtain treatment for his PTSD using only the short-term transitional benefits described in the orders releasing him from active duty, and thereafter from the VA.  Id. at 43.

The sixty-day transitional health care period described in plaintiff's orders expired on October 9, 2003.  Id. at 67-68.  However, plaintiff continued to receive care at Scott Air Force Base for his PTSD through October 22, 2003.[12]  Id. at 83, 86.  The records from both appointments during this time period indicated that plaintiff reported difficulties with concentration but that he was "[r]eleased without limitations."  Id.

Although plaintiff's visits to the Life Skills Clinic were suspended after October 22, 2003, he continued to receive care for his right knee injury at Scott Air Force Base, presumably based on the relevant Line of Duty determination.  Between October 17, 2003, and January 7, 2004, plaintiff had four appointments for this injury.  Id. at 80-82, 84.  In addition, plaintiff had

---

[11]  Plaintiff contacted the VA to take advantage of this benefit, but indicated that he was unable to obtain an appointment until February 4, 2004.  AR 43, 56.  But see id. at 5, 30 (describing medical records from the VA from November and December 2003).

[12]  There is no explanation in the administrative record for why plaintiff continued to receive treatment on Scott Air Force Base after the expiration of the sixty-day transitional period. It is worth noting, however, that plaintiff's medical records contain several relevant comments concerning plaintiff's eligibility for treatment for his PTSD.  See AR 79 (noting, on March 22, 2004, that plaintiff had not received treatment for his PTSD "for several months because he was working on his Line of Duty authorization for care"), 83 (noting, on October 22, 2003, that plaintiff was "working with Ft. Leonard Wood on Line of Duty issue which [it] admits was an error"), 86 (noting, on October 14, 2003, that the appointment might be plaintiff's last one at Scott Air Force Base because he did not have a "line of duty authorization from [the] Army to receive additional care" and that plaintiff was referred to the Medical Evaluation Board at Fort Leonard Wood "to review eligibility"), 87 (noting, on October 14, 2003, that plaintiff was a "non-enrollee"), 90 (noting, on October 3, 2003, that plaintiff indicated that he "might not have eligibility for continued [mental health] treatment here and may be going to the VA" and that plaintiff was referred to the Medical Evaluation Board at Fort Leonard Wood because his condition was incurred on active duty), 92 (noting, on September 29, 2003, that plaintiff might "have benefits until 10/9"), 93 (noting, on September 24, 2003, that plaintiff indicated that "he will be running out of medical benefits" and that plaintiff might "be eligible to receive continued care through the VA").

three appointments at the VA during this time period.[13]  Id. at 5, 30.  A November 21, 2003 "medical providers report" contained notations indicating that plaintiff continued to "explore full time work" and was "given a chance to take [a] new position in [the] military if desired."  Id. at 30; accord id. at 5.  A December 1, 2003 record noted that plaintiff "cont [sic] to find employment which is eluding."[14]  Id. at 30; accord id. at 5.  And, a December 15, 2003 medical record included a notation that plaintiff was "actively pursuing civilian employment."  Id. at 30; accord id. at 5; see also id. at 30 (noting that none of the VA records indicated any "contraindication for employment" by the medical providers).

Plaintiff continued to seek employment during the remainder of 2003.  In a November 16, 2003 electronic mail message to Lieutenant Colonel Eicher, he indicated that he was "interviewing for two private jobs in [Virginia]" and inquired of the status of certain Temporary Tours of Active Duty.  Id. at 24.  On November 17, 2003, plaintiff forwarded copies of his self-prepared military biography and resume to Lieutenant Colonel Eicher, indicating that he "would like to be considered for panel and/or board appointments."  Id. at 15.  Plaintiff sent these same documents to Lieutenant Colonel Eicher on December 4, 2003, and on the following day, he informed Lieutenant Colonel Eicher that he had applied for a Temporary Tour of Active Duty. Id. at 13-14.

With his employment search ongoing, plaintiff sought to ascertain whether his application for a Line of Duty determination for his PTSD was improperly denied.  Id. at 43, 56.  He initially obtained the assistance of Brenda Todd with the Medical Evaluation Board at Fort Leonard Wood, Missouri.  Id. at 43, 56.  Ms. Todd informed plaintiff that the denial of a Line of Duty determination for PTSD was improper and indicated that she would initiate the process to correct the error on his behalf.  Id.  After several weeks of silence from Ms. Todd, plaintiff contacted her, and was informed that she had been directed to cease all efforts on his behalf by the Command Surgeon.  Id.  Ms. Todd told plaintiff that someone from the Command Surgeon's office would contact him, but several more weeks passed without any such communication.  Id.

---

[13]  There was also a fourth appointment at the VA on February 23, 2004, and the medical record from that appointment contained the notation that plaintiff "reported receiving two job offers and . . . was waiting for other job offers."  AR 30; accord id. at 6.  The records from these four visits are not included in the administrative record but are described by both the Command Surgeon and the ABCMR.  See id. at 5-6, 30.

[14]  The precise meaning of "cont" is unclear from the context.  "Continued" appears to be the best fit, but is still grammatically problematic.

Plaintiff then contacted his congressman, Representative W. Todd Akin, for assistance.[15] Representative Akin made some inquiries, and, on December 22, 2003, received a response from Brigadier General Gina S. Farrisee, the Adjutant General of the Army, Army Human Resources Command, Arlington, Virginia. Id. at 63-64. Brigadier General Farrisee first explained that plaintiff was "eligible for continued health benefits for 120 days following his separation date, not 60 days as was told to him . . . ." Id. at 63. She indicated that the misinformation arose from an administrative error–the omission of plaintiff's prior active duty service on his DD Form 214–made when calculating the scope of his benefits. Id. However, because it had been more than 120 days since plaintiff's release from active duty, Brigadier General Farrisee stated that plaintiff was no longer entitled to transitional health care. Id. She explained that only the ABCMR could extend or alter the 120-day period. Id. At the conclusion of her letter, Brigadier General Farrisee outlined three actions that plaintiff could pursue: (1) "apply for health care benefits under the provisions of the Active Duty Medical Extension Program" through the Command Surgeon; (2) apply for incapacitation pay through the Command Surgeon and pursue treatment "at a local military treatment facility"; or (3) seek the correction of his military records from the ABCMR to obtain transitional health care benefits. Id. She noted that the first two actions required a prior Line of Duty determination. Id. Yet, there are no indications that she recognized the precise issue that plaintiff was attempting to resolve via his congressional inquiry–the Army's failure to provide him with a Line of Duty determination for his PTSD.

Nevertheless, in light of Brigadier General Farrisee's letter, plaintiff submitted an application for the correction of his military records to the ABCMR on January 9, 2004, seeking the reinstatement of his transitional health care benefits for at least sixty days, placement on Active Duty Medical Extension, and incapacitation pay. Id. at 60-61. On that same date, contends plaintiff, he sent a letter to the Command Surgeon in St. Louis "requesting procedures for applying for [an Active Duty Medical Extension] and/or incapacitation pay."[16] Id. at 33. Then, on January 11, 2004, plaintiff sent a letter to Brigadier General Farrisee concerning his as-of-yet unsuccessful attempts to obtain a Line of Duty determination for his PTSD. Id. at 52. After receiving plaintiff's letter and reviewing the attached material, Brigadier General Farrisee ascertained that plaintiff should have received a Line of Duty determination for his PTSD prior to his release from active duty and therefore caused such a determination to be issued on February 6, 2004. Id. at 50-51. Accordingly, on March 22, 2004, plaintiff resumed his treatment at the Life Skills Clinic on Scott Air Force Base, remaining a patient there through September 28, 2004. Id. at 69-79. He continued to report difficulties with concentration and how those difficulties affected his legal work. Id. at 69, 73, 75, 77-79. Indeed, plaintiff indicated that his

---

[15] It appears that plaintiff also contacted Senator James Talent for assistance. Plaintiff represents that the Command Surgeon sent Senator Talent a letter in March 2004 "stating that [the Command Surgeon] and Patient Administration at Ft. Leonard Wood, MO, were both aware of [plaintiff's] case and that [plaintiff] should contact Ft. Leonard Wood." AR 33. A copy of the Command Surgeon's letter is not included in the administrative record.

[16] A copy of the letter is not included in the administrative record.

primary care physician prepared a statement on July 1, 2004, addressing plaintiff's employability.[17]  Id. at 34.  The records from all of the appointments during this time period indicated that plaintiff was "[r]eleased without limitations."  Id. at 70-73, 75-79.

    While his Line of Duty determination issue was being resolved, plaintiff continued his search for employment.  On January 13, 2004, plaintiff sent an electronic mail message to Lieutenant Colonel Eicher explaining that he had investigated a position at Fort Bragg, North Carolina and determined that it was "nothing more than a pit stop to go to Iraq."  Id. at 12; see also id. at 31 (indicating that this position was the one referenced on plaintiff's October 4, 2003 electronic mail message).  He also indicated that he could not get a commitment about the duration of a position in Indiana and that he declined a two-week assignment because he "still ha[d] civilian interviews coming up."  Id. at 12.  Finally, plaintiff asked Lieutenant Colonel Eicher about a possible position in Tyler, Texas.  Id.  Subsequently, on March 8, 2004, plaintiff sent another electronic message to Lieutenant Colonel Eicher to update him on his search for employment.  Id. at 11.  He wrote:

> Notwithstanding my GS 14 offer in Washington I am still getting interviews for other positions.  I have one tomorrow with of all places "CITICORP" and another with Lockheed Martin soon.  Can[']t very well plunge into your office and be doing interviews both here and all over the country.  I guess that's why I had initially asked if you needed someone just two or three days a week to take time pressure off you while I am sorting out my future here.
>
>     Anyway there might be another IMA assignment around here that has a one night a week deal that will leave me free to travel around for these interviews.  Hey - if you are really up against a wall and just need somebody for a day or two I would be happy just to come in and spell you while you get your sanity back w/o any points etc.

Id.  One week later, on March 15, 2004, plaintiff sent yet another electronic mail message to Lieutenant Colonel Eicher "to apply for a tour of active duty/active duty for training."  Id. at 30; accord id. at 7.  Attached to the message was a copy of a completed DA Form 7349–"Initial Medical Review - Annual Medical Certificate"– dated March 10, 2004.[18]  Id. at 30; accord id. at 7.  On the form, plaintiff denied any continuing medical problems, but mentioned dental care, physical therapy for his knee, and cholesterol medication.  Id. at 30-31; accord id. at 7.

_____

    [17]  Plaintiff did not indicate precisely what his physician wrote concerning his employability and a copy of that statement is not included in the administrative record.

    [18]  Neither the electronic mail message nor the attached form is included in the administrative record, but both are described by the Command Surgeon and the ABCMR.  See id. at 7, 30-31.

Around the same time, the ABCMR solicited an advisory opinion from the Army Human Resources Command concerning plaintiff's January 9, 2004 application, to which Brigadier General Farrisee responded on April 14, 2004. Id. at 46-47. In her opinion, Brigadier General Farrisee, contrary to her December 22, 2003 letter to Representative Akin, indicated that plaintiff was entitled only to sixty days of transitional health care because he had not yet served eight years on active duty. Id. at 46. She then stated that if the ABCMR did not grant plaintiff's application, plaintiff could use his two Line of Duty determinations to receive military health care. Id. Brigadier General Farrisee next declared plaintiff ineligible for an Active Duty Medical Extension because plaintiff "declined active duty at the time of his release from active duty." Id. Then, with respect to incapacitation pay, she noted that plaintiff could apply for such pay through the proper military channels. Id. In conclusion, Brigadier General Farrisee recommended that the ABCMR deny plaintiff's application. Id.

Plaintiff sent the ABCMR a rebuttal to Brigadier General Farrisee's advisory opinion on April 20, 2004, outlining the difficulties he faced in receiving treatment for his PTSD and highlighting the contradictions between Brigadier General Farrisee's December 22, 2003, and April 14, 2004 letters. Id. at 41-45. With both the advisory opinion and rebuttal in hand, the ABCMR acted on plaintiff's application on July 26, 2004. In lieu of granting or denying the application, the ABCMR returned it to plaintiff without prejudice, for the following reasons:

> [T]he ABCMR will not consider an application until the applicant has exhausted all administrative remedies to correct the alleged error or injustice. In your case, . . . there is no indication that you have ever attempted to apply for incapacitation pay through normal Reserve personnel channels, which would be necessary prior to the Board reviewing your case.
>
> Further, . . . the Board [is prohibited] from acting on cases where there is insufficient evidence to show a probable error or injustice. In your case, there are documents on file that confirm you declined a medical extension while you were still on active duty. This coupled with the fact that you are currently entitled to medical care based on the line of duty investigations makes it appear that there is no error or injustice related to these issues.
>
> Finally, while you have provided information that seems to support your claim that you were improperly counseled regarding the duration of your entitlement to transitional medical care, you provide no evidence to show this resulted in some injustice. Thus, there is insufficient evidence of error or injustice related to this issue.

Id. at 39.

Meanwhile, on June 4, 2004, plaintiff requested a period of active duty for training "to attend a military legal course . . . ." Id. at 31; accord id. at 7. With his application, plaintiff

submitted a completed DA Form 7349, on which he denied any ongoing medical problems or treatment.[19]  Id. at 31; accord id. at 7.  Notwithstanding these representations, plaintiff received orders shortly thereafter indicating that pursuant to 10 U.S.C. §§ 12301, 12322,[20] he was "retained on active duty" to "complete [his] medical care and treatment" at Walter Reed Army Medical Center ("Walter Reed") for a period of 179 days beginning on July 13, 2004.  Id. at 205. Thus, on July 19, 2004, plaintiff entered Walter Reed's Specialized Care Program, a "multidisciplinary intensive outpatient program for the treatment of persistent, disabling [Operation Iraqi Freedom/Operation Enduring Freedom] symptoms."[21]  Id. at 35.  Plaintiff was discharged from the program on August 6, 2004, with a discharge diagnosis of PTSD (along with other diagnoses).  Id. at 37.  His 179-day assignment was thereafter amended, resulting in his release from active duty, "not by reason of physical disability," on October 30, 2004.  Id. at 201, 203-04.

In the meantime, on August 25, 2004, plaintiff sent a letter to the ABCMR in response to its July 26, 2004 rejection of his application, explaining his frustration with his attempts to communicate with the Command Surgeon's office:

> I must ask how many times must I attempt to go through HRC St. Louis when, for whatever reason, they keep failing to respond to my requests?  The call that stopped the initial line of duty determination, the lack of response to the request for [an Active Duty Medical Extension] or incapacitation pay, the response to the Congressional inquiry, and then the denial of any knowledge concerning my issues–provide a strong indication that no matter what I do, it will not be addressed and that is the injustice.  The linear nature of these events in denying benefits seems to constitute more than mere negligence when the erroneous advice is taken into consideration.

---

[19]  Neither the application nor the attached form is included in the administrative record, but both are described by the Command Surgeon and the ABCMR.  See id. at 7, 31.

[20]  Section 12301 is a general provision relating to active duty by members of the military's reserve components.  Section 12322 concerns active duty by members of the military's reserve components for health care purposes.

[21]  Plaintiff indicates that during his attempts to receive care at Walter Reed, the Command Surgeon sent an electronic mail message on June 17, 2004, denying any knowledge of plaintiff's case, which was contrary to the Command Surgeon's March 2004 letter to Senator Talent.  AR 33.  Plaintiff then indicates that when confronted with the March 2004 letter, the Command Surgeon wrote, in a June 19, 2004 electronic mail message, that "he signed but did not compose the March 2004 letter and that [plaintiff's] documentation had been lost."  Id. at 34. Neither electronic mail message from the Command Surgeon is included in the administrative record.

> It is clearly documented that I and my family suffered a hardship both
> financially because I was not employable, and medically where the only insurance
> I had was through the VA and it only covered me.

Id. at 34.  At the conclusion of his letter, plaintiff requested that the ABCMR review this
additional information and reconsider its decision.  Id.  The ABCMR responded to plaintiff's
letter on December 16, 2004.  Id. at 32.  Oddly, it advised plaintiff to follow the March 2004
advice of the Command Surgeon to seek a Line of Duty investigation from the Patient
Administration Division at Fort Leonard Wood, despite plaintiff's receipt of a Line of Duty
determination in February 2004.  Id.  Its response was all the more curious because plaintiff's
letter to the ABCMR did not concern the Line of Duty determination.  The ABCMR indicated
that it would file plaintiff's application "without action and without prejudice" pending "the
response that [plaintiff] receive[d] from Fort Leonard Wood, [Patient Administration Division],
[Line of Duty] Office . . . ."  Id.  There is no evidence in the administrative record indicating how
the ABCMR ultimately disposed of this application.

On an unspecified date after the ABCMR returned plaintiff's July 26, 2004 application,
plaintiff applied to the Command Surgeon for incapacitation pay.[22]  Id. at 29.  On June 27, 2005,
the Command Surgeon rejected plaintiff's application.  Id.  In support of his determination, the
Command Surgeon first indicated that "during the period of [plaintiff's] claim, 11 Aug 2003 - 12
Jul 2004, [plaintiff was] medically cleared by Army, Air Force, and VA physicians to work [and]
perform both military and civilian jobs."[23]  Id.  The Command Surgeon then indicated that
"[b]ased on a review of records documenting [plaintiff's] diligent pursuit of employment, several
job interviews attended, and job offers [plaintiff] did not accept during the 11 Aug 2003 - 12 Jul
2004 period, it is reasonable to surmise [plaintiff] did not obtain the preferable job offers."  Id.
Although he was sympathetic to plaintiff's situation, the Command Surgeon explained that "in
accordance with Army regulations, we cannot use those circumstances as sole justification for
incapacitation pay."  Id.

Approximately twenty months later, on February 28, 2007, plaintiff submitted an
application to the ABCMR appealing the Command Surgeon's denial of his request for
incapacitation pay for the period spanning August 2003 through July 2004.  Id. at 28.  He
contended that the Command Surgeon did not "fairly and objectively" evaluate the relevant
evidence.  Id.  In particular, plaintiff asserted that the Command Surgeon ignored the treatment
records from three military hospitals, "used self serving facts," and disregarded "any evidence

_____

[22]  No such application appears in the administrative record, but its existence is inferred
from the Command Surgeon's rejection of plaintiff's "request for incapacitation pay" on June 27,
2005.  See AR 29.

[23]  The Command Surgeon referred to an April 25, 2004 physical examination in support
of this conclusion.  AR 31.  However, there was no such examination, as the ABCMR later
acknowledged.  Id. at 9.

supporting" plaintiff's position.  Id.  Thus, argued plaintiff, the Command Surgeon "made conclusory and unsupported findings . . . ."  Id.

The ABCMR denied plaintiff's application on December 18, 2007, finding insufficient evidence to support plaintiff's claim.  Id. at 1-10.  It explained that the purpose of incapacitation pay was "to compensate Reservists for the loss of civilian income experienced as a result of an injury or disease incurred while performing military duties."  Id. at 8.  Although it conceded that plaintiff was diagnosed with PTSD while serving on active duty in Kuwait, obtained a Line of Duty determination for his PTSD, and received treatment for his PTSD at Fort Benning, Walter Reed, and the VA,[24] the ABCMR found that "the medical evidence provided by [plaintiff was] not sufficiently compelling to conclude that he was unable to be employed during the period."  Id.  It further explained:

> The medical treatment records provided, while alluding to problems related to employment, do not state with certainty that the applicant was unable to work during this period, and there is no medical evidence that would support a conclusion that he was medically disqualified from further military service based on his condition.

Id.  Moreover, the ABCMR found that there was "significant evidence that suggest[ed plaintiff] was seeking both civilian and military employment during the period, and that he in fact had an offer of civilian employment that he declined during the period."  Id. at 9.  Accordingly, the ABCMR determined that plaintiff had "failed to provide convincing and compelling evidence confirming he was unable to obtain and perform civilian employment during the period in question" and that there was "no military medical evidence indicating that [plaintiff's] PTSD condition was physically disqualifying for further military service."  Id.

Altogether, the ABCMR concluded that plaintiff "failed to provide a compelling argument that would support a reversal of the denial of incapacitation pay in his case, which was primarily based on the medical evidence that his condition did not prevent his civilian employment, and that he was actively seeking employment during the period."  Id.  It further determined that there was "an insufficient evidentiary basis to conclude that [plaintiff] experienced a loss of civilian income solely as a result of an injury or disease he incurred while performing military duties."  Id.  In sum, the ABCMR determined that plaintiff "failed to submit evidence" that the record in his case was "in error or unjust."  Id.

Plaintiff filed his complaint in this court on December 1, 2008, claiming that he was wrongfully denied incapacitation pay for the eleven-month period spanning August 11, 2003, through July 12, 2004.  Compl. ¶ 1.  Specifically, plaintiff asserts that the Command Surgeon's

---

[24]  The ABCMR did not specifically mention the treatment received by plaintiff at the Life Skills Clinic on Scott Air Force Base here, but it is clear from the remainder of its decision that it considered those records.

June 27, 2005 decision denying his application for incapacitation pay "contained manifest error" and was "clearly erroneous" because it contained "conclusions that were either contradicted or not supported by the record."[25]  Id. ¶ 11.  Thus, plaintiff requests a declaration that he is entitled to incapacitation pay and an award of the unpaid incapacitation pay.  Id. ¶¶ 13, 14.

In the instant combined motion, defendant seeks dismissal of plaintiff's complaint on jurisdictional grounds or, in the alternative, judgment on the administrative record.  The parties have fully briefed defendant's combined motion.  Finding oral argument unnecessary, the court is prepared to rule.

## II.  DEFENDANT'S MOTION TO DISMISS

### A.  Standard of Review Under RCFC 12(b)(1)

In ruling on a motion to dismiss, the court assumes that the allegations in the complaint are true and construes those allegations in plaintiff's favor.  Henke v. United States, 60 F.3d 795, 797 (Fed. Cir. 1995).  However, plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject matter jurisdiction.  McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936); Reynolds v. Army & Air Force Exch. Serv., 846 F.2d 746, 748 (Fed. Cir. 1988).  The court may look to evidence outside of the pleadings to determine the existence of subject matter jurisdiction.  Land v. Dollar, 330 U.S. 731, 735 & n.4 (1974); Reynolds, 846 F.2d at 747.  If the court concludes that it lacks subject matter jurisdiction over a claim, RCFC 12(h)(3) requires the court to dismiss that claim.

### B.  Subject Matter Jurisdiction

Whether the court has jurisdiction to decide the merits of a case is a threshold matter.  See Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998).  "Without jurisdiction the court cannot proceed at all in any cause.  Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause."  Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868).  The parties or the court sua sponte may challenge the court's subject matter jurisdiction at any time.  Arbaugh v. Y & H Corp., 546 U.S. 500, 506 (2006).

The ability of the United States Court of Federal Claims ("Court of Federal Claims") to entertain suits against the United States is limited.  "The United States, as sovereign, is immune from suit save as it consents to be sued."  United States v. Sherwood, 312 U.S. 584, 586 (1941).  The waiver of immunity "cannot be implied but must be unequivocally expressed."  United States v. King, 395 U.S. 1, 4 (1969).

---

[25]  In his complaint, plaintiff does not mention the ABCMR's decision upholding the Command Surgeon's denial of plaintiff's request for incapacitation pay.

The Tucker Act, the principal statute governing the jurisdiction of this court, provides that the Court of Federal Claims has jurisdiction over claims against the United States that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2006). The Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." <u>United States v. Testan</u>, 424 U.S. 392, 398 (1976). Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." <u>Loveladies Harbor, Inc. v. United States</u>, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). To find that a constitutional provision, statute, or regulation is money-mandating, "the allegation must be that the particular provision of law relied upon grants the claimant, expressly or by implication, a right to be paid a certain sum." <u>Eastport S.S. Corp. v. United States</u>, 372 F.2d 1002, 1007 (Ct. Cl. 1967); <u>see also id.</u> at 1009 ("Under Section 1491, what one must always ask is whether the constitutional clause or legislation which the claimant cites can fairly be interpreted as mandating compensation by the Federal Government for the damage sustained.").

## C. Plaintiff Has Established This Court's Jurisdiction Over His Complaint

Plaintiff expressly alleges jurisdiction in this court pursuant to three provisions of title 28 of the United States Code: sections 1491(a)(1), 2501, and 1346(a)(2). As noted above, section 1491(a)(1) is merely a general jurisdictional statute that must be accompanied by a substantive, money-mandating source of law. Neither of the other two provisions cited by plaintiff are money-mandating. Section 2501 establishes a six-year limitations period for filing suit in the Court of Federal Claims, and section 1346(a)(2) provides the Court of Federal Claims with exclusive jurisdiction over certain Tucker Act suits when the amount in controversy exceeds $10,000. Nevertheless, plaintiff's factual allegations do implicate a money-mandating source of law.

That source is 37 U.S.C. § 204, which governs service members' entitlement to basic pay. Subsection 204(g) provides:

> A member of a reserve component of a uniformed service is entitled to the pay and allowances provided by law or regulation for a member of a regular component of a uniformed service of corresponding grade and length of service whenever such member is physically disabled as the result of an injury, illness, or disease incurred or aggravated--
>
> > (A) in line of duty while performing active duty . . . .

37 U.S.C. § 204(g)(1); <u>see also id.</u> § 204(g)(2) (indicating that "the total pay and allowances shall be reduced by" any nonmilitary income). And, subsection 204(h) provides:

> A member of a reserve component of a uniformed service who is physically able
> to perform his military duties, is entitled, upon request, to a portion of the monthly
> pay and allowances provided by law or regulation for a member of a regular
> component of a uniformed service of corresponding grade and length of service
> for each month for which the member demonstrates a loss of earned income from
> nonmilitary employment or self-employment as a result of an injury, illness, or
> disease incurred or aggravated--
>
>    (A)  in line of duty while performing active duty . . . .

Id. § 204(h)(1); see also id. § 204(h)(2) (indicating that "[t]he monthly entitlement may not exceed the member's demonstrated loss of earned income from nonmilitary or self-employment"). In other words, section 204 provides for payment of incapacitation pay to compensate soldiers for lost civilian income resulting from injuries incurred while on active duty. See also Army Regulation 135-381, § 4-1(a) to (c), (g). Such incapacitation pay cannot be paid "for a period of more than six months" unless the Secretary of the relevant service "determines that it is in the interests of fairness and equity to do so." 37 U.S.C. § 204(i)(2).

The United States Court of Appeals for the Federal Circuit ("Federal Circuit") has repeatedly concluded that section 204, in general, is a money-mandating statute. See, e.g., Metz v. United States, 466 F.3d 991, 998 (Fed. Cir. 2006) (noting that 37 U.S.C. § 204 "has previously been held to be money-mandating"); James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998) ("If an enlisted member of the Armed Services is wrongfully discharged before the end of his or her current term of enlistment, the right to pay conferred by § 204 continues and serves as the basis for Tucker Act jurisdiction."); Holley v. United States, 124 F.3d 1462, 1465 (Fed. Cir. 1997) ("It is well-established that 37 U.S.C. § 204 . . . serves as the money-mandating statute applicable to military personnel claiming damages and ancillary relief for wrongful discharge."); Sanders v. United States, 594 F.2d 804, 810 (Ct. Cl. 1979) (en banc) ("37 U.S.C. § 204 provides the basic entitlement to pay for commissioned officers in the armed services. The statute confers on an officer the right to the pay of the rank he was appointed to up until he is properly separated from the service."), abrogated in part on other grounds by The Defense Officer Personnel Management Act, Pub. L. No. 96-513, § 105, 94 Stat. 2835, 2859-60 (1980) (codified as amended at 10 U.S.C. § 628(b) (2000)). However, the cases in which the Federal Circuit reached that conclusion were military discharge cases arising under subsection 204(a), not incapacitation cases arising under subsections 204(g) or 204(h). See Metz, 466 F.3d at 994; James, 159 F.3d at 575; Holley, 124 F.3d at 1464; Sanders, 594 F.2d at 806. Subsection 204(a) identifies those individuals who "are entitled to the basic pay of the pay grade to which assigned or distributed, in accordance with their years of service . . . ." Similarly, subsection 204(g)(1) provides that reservists who are physically disabled due to an injury incurred in the line of duty while on active duty are "entitled to . . . pay and allowances" and subsection 204(h)(1) provides that reservists who have lost nonmilitary income due to an injury incurred in the line of duty while on active duty are "entitled, upon request, to a portion of the monthly pay and allowances . . . ." Because both subsections

204(g) and 204(h) speak in terms of "entitlement" to pay in a manner similar to subsection 204(a), the court concludes that they are money-mandating statutory provisions.

As defendant points out, plaintiff does not cite 37 U.S.C. § 204 in his complaint. This omission is not fatal to plaintiff's case, however. Plaintiff clearly alleges that he is seeking incapacitation pay. He identifies the Command Surgeon's June 27, 2005 decision denying his claim for incapacitation pay and contends that the denial was wrongful. Compl. ¶¶ 1, 10-11. Moreover, he specifically requests an award of unpaid incapacitation pay. Id. ¶ 14. These allegations are sufficient to permit the court to exercise jurisdiction over plaintiff's complaint.

As a final note, although the court possesses jurisdiction over plaintiff's complaint pursuant to subsections 204(g) and 204(h), that jurisdiction is circumscribed by the plain language of subsection 204(i)(2), which limits the payment of any nondiscretionary portion of incapacitation pay to a period that does not exceed six months. See Deshauteurs v. United States, 39 Fed. Cl. 263, 267-68 (1997) (holding that the Court of Federal Claims lacked jurisdiction over a claim under 10 U.S.C. § 204(i)(2) for incapacitation pay due to the wholly discretionary nature of awards in excess of six months); accord Joseph v. United States, 62 Fed. Cl. 415, 418 (2004). Plaintiff concedes this limitation on the court's jurisdiction. Accordingly, the court will only entertain plaintiff's claim for incapacitation pay for the six-month period beginning August 11, 2003, and not the entire eleven-month period alleged.

## III.  DEFENDANT'S MOTION FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

### A.  Standard of Review Under RCFC 52.1

In addition to its motion to dismiss, defendant filed a motion for judgment on the administrative record pursuant to RCFC 52.1, seeking to uphold the ABCMR's December 18, 2007 decision declining to amend plaintiff's military record.[26] In ruling on a motion for judgment on the administrative record, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United

---

[26] As noted previously, plaintiff does not mention in his complaint that he sought the correction of his military records by the ABCMR to reflect an award of incapacitation pay. Rather, he couches his complaint as an appeal of the Command Surgeon's denial of his application for incapacitation pay. See Compl. ¶¶ 1, 10-11, 13. However, because plaintiff sought relief from the ABCMR, the court must review the ABCMR's decision, not the initial denial by the Command Surgeon. See Metz, 466 F.3d at 998 ("[A] service member need not seek relief from a military corrections board before suing in the Court of Federal Claims. However, . . . when a service member does pursue such relief, the Court of Federal Claims reviews the Board's action under the same standard as any other agency action." (citation omitted)).

States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[27]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, Inc., 404 F.3d at 1356.

The ABCMR's decision was authorized by 10 U.S.C. § 1552 (2006), which allows for the correction of military records "to correct an error or remove an injustice."  The decisions of the ABCMR are entitled to deference.  Bray v. United States, 515 F.2d 1383, 1391 (Ct. Cl. 1975) (per curiam); see also Heisig v. United States, 719 F.2d 1153, 1156 (Fed. Cir. 1983) (noting that a court is not to substitute its judgment for that of the correction board "when reasonable minds could reach differing conclusions on the same evidence").  Accordingly, the court "will not disturb the decision of [a] corrections board unless it is arbitrary, capricious, contrary to law, or unsupported by substantial evidence."  Chambers v. United States, 417 F.3d 1218, 1227 (Fed. Cir. 2005); accord Bray, 515 F.2d at 1391.  In this case, plaintiff argues that the ABCMR's decision was not supported by substantial evidence.  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951), quoted in Nippon Steel Corp. v. United States, 458 F.3d 1345, 1351 (Fed. Cir. 2006).  To determine whether substantial evidence supports a decision, "[a] reviewing court must consider the record as a whole . . . ."  Nippon Steel Corp., 458 F.3d at 1351.  However, the court is not to reweigh the evidence.  Dixon v. Dep't of Transp., FAA, 8 F.3d 798, 804 (Fed. Cir. 1993).

## B.  The Law Regarding Incapacitation Pay

The Army has promulgated a regulation to implement the provisions of 37 U.S.C. § 204 concerning entitlement to incapacitation pay: Army Regulation 135-381, "Incapacitation of Reserve Component Soldiers."[28]  The regulation indicates that 37 U.S.C. § 204 allows for the "continuation of pay . . . under certain circumstances to soldiers who are disabled [in the line of duty] from injury, illness, or disease."  Army Regulation 135-381, § 4-1(a).  A soldier can receive incapacitation pay "for each period [he] is unable to perform normal military duties or can demonstrate loss of compensation from non-military income."  Id. § 4-1(g).  Any income received from civilian sources, however, is subtracted from the soldier's incapacitation pay.  Id.  The regulation accordingly reflects the purpose of incapacitation pay–to compensate soldiers for lost civilian income resulting from injuries incurred in the line of duty while on active duty.

---

[27]  The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1 was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

[28]  The version of the regulation in effect when plaintiff was released from active duty after his tour in Kuwait was issued on June 1, 1990.  The regulation was significantly overhauled and reissued on August 29, 2005.

The regulation also enumerates the specific prerequisites for obtaining incapacitation pay. First, a soldier requesting incapacitation pay must possess a Line of Duty determination. Id. § 4-1(d).  In addition, the soldier must establish the following four requirements: "(1) Inability to perform normal military duties or demonstrated loss of nonmilitary income; (2) A finding that the soldier was disabled 'while so employed'; (3) The injury, illness, or disease was incurred or aggravated while in a duty or travel status"; and "(4) Eligibility to receive incapacitation pay." Id.; see also id. §§ 4-1(e) ("Prerequisites for entitlement to incapacitation pay are inability to perform normal military duties or satisfactory demonstration of loss of nonmilitary income."), 4-1(k) ("Each request is judged on a case-by-case basis and is based on a soldier's inability to perform normal military duties or demonstrated loss of nonmilitary income."), 4-6(a)(1) (noting that incapacitation pay may be authorized for reservists serving on active duty for more than thirty days).

The instant case implicates two of the factors considered when awarding incapacitation pay: plaintiff's ability to perform normal military duties and plaintiff's nonmilitary income.  An award of incapacitation pay can be made if an applicant establishes either of these two factors. Id. § 4-1(d)-(e), (g), (k).  The regulation describes the evidence necessary for demonstrating these factors:

> a.  Determination of inability to perform normal military duties will be made by military medical authority . . . .

> b.  Demonstration of lost nonmilitary income will be provided by the soldier as indicated by his or her employer(s) on company or Government agency letterhead and certified by an official of the company or Government agency.  At a minimum, the letter must contain the information listed below.  . . .

> > (1)  The amount of gross nonmilitary income lost during the period of the claim and any payments made or benefits claimed under the employer's income protection plan (such as insurance) or sick leave.

> > (2)  . . . . [Whether] the employee "is" or "is not" covered by an income protection plan.

> > (3)  [A statement acknowledging that it is a criminal offense to make, or assist in making, a false claim.]

Id. § 4-2(a) to (b).  Accordingly, the court will evaluate the ABCMR's decision in plaintiff's case in light of those requirements.

**C.  Plaintiff Has Not Established That He Was Unable to Perform His Military Duties**

As previously noted, plaintiff could have prevailed on his claim for incapacitation pay if he had demonstrated either an inability to perform his military duties or a loss on nonmilitary income.  In his opposition to defendant's motion for judgment on the administrative record, plaintiff argues that his claim for incapacitation pay was premised solely on his inability to perform his military duties.  The ABCMR made the several findings related to this factor.  First, it found that there was "no medical evidence that would support a conclusion that [plaintiff] was medically disqualified from further military service based on his condition."  AR 8.  Next, it found that plaintiff was seeking military employment upon his release from active duty in August 2003.  Id. at 9.  Finally, it found that there was "no military medical evidence indicating that [plaintiff's] PTSD condition was physically disqualifying for future military service."  Id.  Although all three of the ABCMR's findings are fully supported by the record, the last finding is the most important.

Pursuant to Army Regulation 135-381, the only method of establishing a soldier's inability to perform his military duties is to show that a "military medical authority" made such a finding.  Indeed, it is well-settled that the determination of a member's fitness to serve is within the province of the military and is entitled to deference.  See Fisher v. United States, 402 F.3d 1167, 1176-77 (Fed. Cir. 2005) (panel portion) ("When the question is one of physical or mental fitness for service in the military, courts are loath to interfere with decisions made by the President and his designated agents."); Heisig, 719 F.2d at 1156 ("It is equally settled that responsibility for determining who is fit or unfit to serve in the armed services is not a judicial province; and that courts cannot substitute their judgment for that of the military departments when reasonable minds could reach differing conclusions on the same evidence." (footnote omitted)).

Here, the administrative record lacks any military medical records containing the determination that plaintiff was unable to perform his normal military duties.  Plaintiff received medical treatment at Fort Benning, Scott Air Force Base, Walter Reed, and the VA.  The bulk of the medical records from these locations indicate that plaintiff's physicians found him fit for duty.  First, the military psychiatrist who examined plaintiff on July 17, 2003, declared that plaintiff was stable and provided no indication that plaintiff was unfit for duty.  See AR 30.  Second, at the conclusion of his separation physical examination on July 18, 2003, plaintiff was medically cleared for release from active duty.  See id. at 5, 30.  Third, plaintiff was actually released from active duty, "not by reason of physical disability," on August 10, 2003.  See id. at 207-08.  Fourth, most of the medical records from Scott Air Force Base from August 2003 through September 2004 indicate that plaintiff's physicians released him "without limitations."  See id. at 70-73, 75-79, 83, 86, 88-93, 95-98, 100, 103-05.  Fifth, plaintiff submitted fully executed Annual Medical Certificates with his applications for active duty assignments on March 15, 2004, and June 4, 2004, certifying that he was fit for duty.  See id. at 7, 30-31.  Finally, plaintiff was released from active duty after his treatment at Walter Reed on October 30, 2004, "not by reason of physical disability . . . ."  Id. at 201.

-19-

Plaintiff is quick to point out that his military physicians suggested duty limitations in a few instances. These included several recommendations against deployment, see id. at 91 (Oct. 3, 2003), 94 (Sept. 19, 2003), 96 (Sept. 11, 2003), 99 (Aug. 22, 2003), 101 (Aug. 14, 2003), and four recommendations of duty limitations, see id. at 94 (Sept. 19, 2003), 99 (Aug. 22, 2003), 101 (Aug. 14, 2003), 102 (Aug. 5, 2003).[29] However, such limitations do not amount to findings that plaintiff was unable to perform military duties. Moreover, these limitations are clearly outweighed by the bulk of the military medical records indicating that plaintiff's physicians found him fit for duty. Accordingly, the ABCMR's decision that the record was devoid of the necessary evidence demonstrating that plaintiff was unable to perform his military duties must be upheld by this court as supported by substantial evidence.

### D. Plaintiff Has Not Demonstrated a Loss of Civilian Income

Because plaintiff could not prove to the ABCMR that he was unable to perform his military duties, his claim for incapacitation pay rested on demonstrating a loss of civilian income. Unlike the factor previously discussed, the method for establishing a loss of civilian income is difficult to apply to plaintiff. Army Regulation 135-381 appears to have been drafted to address the situation of a reservist whose civilian employment was interrupted by a call to active duty–whether it be for training or for some other purpose. See, e.g., Army Regulation 135-381, § 4-2(b) (requiring a letter from an employer to support a claim for lost civilian pay). However, plaintiff was not in that situation. There is no convincing evidence in the record that he was employed in a civilian capacity at the time he was called to active duty in August 2002 or that he did, or intended to, return to a previously held civilian position upon his release from active duty in August 2003. Thus, it appears that the ABCMR identified the purpose of incapacitation pay–"to compensate Reservists for the loss of civilian income experienced as a result of an injury . . . incurred while performing military duties"–and sought to determine whether plaintiff's claim fit within that purpose. AR 8. Given the constraints of the applicable regulation, it was not in error for the ABCMR to take this approach.

The ABCMR made several findings concerning plaintiff's loss of civilian income with the purpose of incapacitation pay in mind. First, it found that "the medical evidence provided by [plaintiff was] not sufficiently compelling to conclude that he was unable to be employed" after his release from active duty, explaining that "[t]he medical treatment records provided, while alluding to problems related to employment, [did] not state with certainty that [plaintiff] was unable to work . . . ." AR 8. Next, the ABCMR found that there was "significant evidence that suggests [plaintiff] was seeking . . . civilian . . . employment" after his release from active duty, "and that he in fact had an offer of civilian employment that he declined . . . ." Id. at 9. Accordingly, the ABCMR concluded, plaintiff "failed to provide convincing evidence

---

[29] Because three instances of duty limitations were suggested coincident to the deployment recommendations, the court infers that the duty limitations were the recommendations against deployment.

confirming he was unable to obtain and perform civilian employment . . . ."  Id.  Finally, noting that the Command Surgeon's decision "was based on the medical evidence that [plaintiff's] condition did not prevent his civilian employment," the ABCMR determined that "[b]ased on the evidence provided, there [was] an insufficient evidentiary basis to conclude that [plaintiff] experienced a loss of civilian income solely as a result of an injury or disease he incurred while performing military duties."  Id.

The ABCMR's findings are supported by substantial evidence.  The ABCMR correctly noted that although the medical records referenced plaintiff's difficulties with performing his legal work, none of the records indicate that plaintiff was actually unable to work.  In fact, the only records suggesting that plaintiff was prescribed work limitations, see id. at 94 (Sept. 19, 2003), 99 (Aug. 22, 2003), 101 (Aug. 14, 2003), 102 (Aug. 5, 2003), are clearly outweighed by the lack of such a recommendation in the remaining records.  Moreover, plaintiff was actively seeking military and civilian employment upon his release from active duty.  By applying for jobs, attending job interviews, and entertaining offers of employment, plaintiff was presenting himself to prospective employers as being ready and able to work.  Furthermore, plaintiff appears to have actually declined a job offer, see AR 11 (noting his decision to embark on additional job interviews despite an offer of employment from the federal government), suggesting that his problem was not that he was unemployable, but that he had not yet found a job that satisfactorily met his criteria.  Finally, although not cited by the ABCMR in support of its decision, there is evidence in the administrative record that plaintiff actually held civilian employment in 2003 with JDG Associates.  Id. at 16, 18.  Altogether, the court finds no error in the ABCMR's conclusion that plaintiff had not established a loss of civilian income.

## IV. CONCLUSION

The court is sympathetic to the frustrations endured by plaintiff that were caused by the conflicting advice he received from various Army offices regarding his medical treatment upon his return from Kuwait.  Plaintiff, like the many men and women in our military, bravely and honorably served his country, and should have received the best health care that the Army was able to provide.  A critical component of obtaining optimal health care is the receipt of prompt and correct advice in response to inquiries pertaining to eligibility for, and availability of, medical treatment.  In this case, the record reflects that the military personnel tasked with dispensing such advice failed plaintiff on multiple occasions.  However, the rules regarding entitlement to incapacitation pay, as set forth in 37 U.S.C. § 204(g)-(h) and Army Regulation 135-381, are explicit, and plaintiff has failed to demonstrate entitlement pursuant to those rules. The ABCMR did not err in so holding, and its findings are supported by substantial evidence.

Accordingly, as set forth above, the court **GRANTS IN PART** and **DENIES IN PART** defendant's motion to dismiss for lack of jurisdiction and **GRANTS** defendant's motion for judgment on the administrative record.  No costs.  The clerk shall enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge